2005 SD 87

**FLANDREAU PUBLIC SCHOOL DISTRICT # 50–3, Plaintiff and Appellee,**

v.

**G.A. JOHNSON CONSTRUCTION, INC., Defendant, Third Party Plaintiff and Appellant,**

**Williams Brothers Masonry Joint Venture, LLC, Third Party Defendant.**

**No. 23419.**

Supreme Court of South Dakota.

Considered on Briefs May 23, 2005.

Decided July 13, 2005.

Wilson M. Kleibacker of Lammers, Kleibacker & Brown, LLP, Madison, South Dakota Attorneys for appellee.

William G. Beck, Mary Ellen Dirksen of Woods, Fuller, Shultz and Smith, Sioux Falls, South Dakota, Attorneys for appellants.

ZINTER, Justice.

[¶ 1.] Flandreau School District and G.A. Johnson Construction entered into an agreement for the construction of an elementary school. The agreement included a provision requiring alternative dispute resolution (arbitration).[1] A dispute subsequently arose over the appearance of the interior walls of the building, and Flandreau brought suit against Johnson in circuit court. Johnson moved to dismiss or compel arbitration. The trial court denied the motion. Johnson appeals and we affirm.

### Facts and Procedural History

[¶ 2.] On April 19, 2002, the Flandreau School District (Flandreau) and G.A. Johnson Construction (Johnson) entered into an agreement for the construction of an elementary school. This agreement provided that if a dispute arose, "an initial decision by the Architect shall be required as a condition precedent to mediation, arbitration or litigation of all claims. . . ." The agreement further provided that, after the architect's decision, "[a]ny claim arising out of or related to the Contract, *except Claims relating to aesthetic effect* . . . shall be subject to mediation as a condition precedent to arbitration or the institution of legal or equitable proceedings by either party." (Emphasis added). Any claim remaining after mediation, *except one involving aesthetics*, was then subject to arbitration. The agreement finally provided that mediation and arbitration were to be conducted in compliance with the Construction Industry Arbitration Rules of the American Arbitration Association (AAA). Those arbitration rules provided that the arbitrator had "the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement." AAA Rule R–8(a).

[¶ 3.] Dissatisfied with the appearance of the masonry walls in the school, Flandreau met with the architect and the legal

---

1. The agreement provided for mediation and arbitration. For purposes of simplicity, mediation and arbitration will be referred to as "arbitration." Pursuant to the parties' agreement, both forms of alternative dispute resolution were to be conducted in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association. Although these rules refer only to "arbitration," the parties' agreement expressly provided that mediation was subject to the same procedures.

representatives of Johnson. Flandreau subsequently filed a complaint in circuit court alleging substandard material and poor workmanship (allegedly falling below industry standards and violating project specifications). Because the parties had not arbitrated, Johnson moved to dismiss or compel arbitration. Johnson's motion incorporated evidence outside the pleadings (the agreement between owner and contractor, and the general conditions of the contract for construction). Flandreau opposed the motion contending that arbitration was not required for claims relating to aesthetic effect. Flandreau also submitted evidence outside the pleadings (an affidavit of the Flandreau School Board President and a report from an engineering consultant describing the alleged defects and suggested repairs).

[¶ 4.] Following a hearing, the trial court denied the motion to dismiss or compel arbitration. It found that "the reason necessitating the complaint of [Flandreau] is the unacceptable aesthetic quality of the workmanship and not any major structural defects...." The court further observed that "any time you have a complaint founded on [aesthetics] you are going to have negligence, poor workmanship, or improper construction complaints...." Because

the trial court found that the complaint was "primarily related to aesthetics," it concluded that the aesthetic effect exception in the parties' arbitration agreement was applicable and arbitration was not required.

[¶ 5.] Johnson appealed under SDCL 21–25A–35(1),[2] which permits an appeal from the circuit court's denial of an application to compel arbitration. Johnson contends that the trial court erred in not allowing the arbitrator to initially determine whether this dispute was subject to arbitration. Johnson also contends that the trial court erred in failing to compel arbitration. Johnson argues that some of the issues in this dispute did not involve aesthetics, and when arbitrable issues cannot be separated from non-arbitrable issues, the entire claim should be submitted to arbitration.

### Standard of Review

*Conversion of a Motion to Dismiss to a Motion for Summary Judgment*

[¶ 6.] In determining our standard of review, we observe that although this matter is before us on a motion to dismiss, both parties submitted matters outside the pleadings, and the trial court did not explicitly exclude them.[3] However, we also

---

2. SDCL 21–25A–35 provides:

> An appeal may be taken from:
> (1) An order denying an application to compel arbitration made under § 21–25A–5;
> (2) An order granting an application to stay arbitration made under § 21–25A–8;
> (3) An order confirming or denying confirmation of an award;
> (4) An order modifying or correcting an award;
> (5) An order vacating an award without directing a rehearing; or
> (6) A judgment or decree entered pursuant to the provisions of this chapter.
> The appeal shall be taken in the manner and to the same extent as from orders or judgments in a civil action.

3. Johnson moved to dismiss for failure to state a claim upon which relief could be granted (although not specified in the motion, the briefs reflect that it was a SDCL 15–6–12(b)(5) motion). SDCL 15–6–12(b) describes the procedure that must be followed when matters outside the pleadings are presented in considering a motion to dismiss:

> If, on a motion asserting the defense numbered (5) to dismiss for failure of the pleading to state a claim upon which relief can be granted, *matters outside the pleading are presented to and not excluded* by the court, the motion *shall* be treated as one for summary judgment and disposed of as provided in § 15–6–56, and all parties shall be given reasonable opportunity to present all mate-

observe that neither party objected to the trial court's consideration of those matters and neither party raised the issue on appeal. Therefore, we review the trial court's ruling as a motion for summary judgment. *Tibke v. McDougall,* 479 N.W.2d 898, 903–04 (S.D.1992) (stating that when the record indicates that matters outside of the pleadings were considered by the trial court, motions to dismiss are reviewed and disposed of as motions for summary judgment).[4]

[¶ 7.] Because we review this matter as a summary judgment, we "restrict our review to determining whether the record before us discloses any genuine issues of material fact and, if not, whether the ... court committed any errors of law." *Switlik v. Hardwicke Co., Inc.,* 651 F.2d 852, 857–58 (3dCir.1981) (*assuming* that the trial court had converted a motion to dismiss to a motion for summary judgment). In performing that review, "the construction and legal effect of a written [arbitration] contract are to be determined by the court as a question of law except where the meaning of the language depends upon disputed extrinsic evidence." *May Const. Co., Inc. v. Benton School Dist. No. 8,* 320 Ark. 147, 895 S.W.2d 521, 523 (1995) (citing *Duvall v. Massachusetts*

*Indem. & Life Ins. Co.,* 295 Ark. 412, 748 S.W.2d 650 (1988)). We review legal questions concerning arbitration agreements de novo. *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 947–48, 115 S.Ct. 1920, 1926, 131 L.Ed.2d 985, 996 (1995).

### Decision

*Arbitrability and Who Should Determine It*

[¶ 8.] If a valid agreement to arbitrate exists, the "court shall order the parties to proceed with arbitration." SDCL 21–25A–5. Both parties agree that there is an agreement to arbitrate but it is subject to an exception for "[c]laims relating to aesthetic effect." Notwithstanding the aesthetic effect exception, Johnson argues that Flandreau's claim is subject to arbitration and that the arbitrator, rather than the court, should have initially determined the arbitrability of this dispute. Johnson supports his arguments by asserting that this dispute actually involves a number of non-aesthetic issues, namely: the arbitrability of this claim, and the issues of substandard material and poor workmanship. Johnson points out that the latter issues raise further non-aesthetic issues of breach

---

rial made pertinent to such a motion by § 15–6–56.
(Emphasis added.)

4. Although we have routinely remanded similar cases to enforce the mandatory conversion requirements of SDCL 15–6–12(b), those requirements may be waived when the parties neither object below nor allege an inadequate hearing. For example, in *Batiste v. Burke,* 746 F.2d 257, 258–59 (5thCir.1984), the court reviewed a motion to dismiss, which involved the trial court's consideration of an employee personnel handbook that was not within the pleadings. Although the motion to dismiss was not expressly converted, the Fifth Circuit reviewed the matter as a motion for summary judgment, *assuming* that the trial court had

treated it as summary judgment (*i.e.* it reviewed the record for material issues of fact and entitlement to judgment as a matter of law). *See id.* at 259 n. 2 (stating that where one of the parties neither objected to nor raised the issue of conversion, the motion to dismiss was properly converted to a *motion for summary judgment*). *See also Switlik v. Hardwicke Co., Inc.,* 651 F.2d 852, 857–58 (3dCir.1981) (assuming that the trial court had converted a motion to dismiss to a motion for summary judgment because it had not expressly excluded an affidavit, because the parties were given a full opportunity to present evidence, and because the appellants had not claimed prejudice as a result of the conversion nor had either party mentioned that procedural defect of the case).

of contract and compliance with industry standards.

[¶ 9.] Johnson's arguments require us to more precisely define the nature of this dispute and the rules governing a court's review of each disputed issue. As the Supreme Court has explained, this kind of case really involves three issues that require different types of judicial review. *First Options,* 514 U.S. at 942, 115 S.Ct. at 1923, 131 L.Ed.2d at 992. First, there is a disagreement about the *merits* of the dispute; i.e. aesthetics and allegations of substandard material, poor workmanship, breach of contract, and compliance with industry standards. Second, there is a disagreement about *whether* the parties agreed to arbitrate the merits. That is an issue about the arbitrability of the dispute. Third, there is a disagreement about *who* should have the primary power to determine the second matter. "Does that power belong primarily to the arbitrators (because the court reviews their arbitrability decision deferentially) or to the court (because the court makes up its mind about arbitrability independently)?" *Id.* Because the questions of arbitrability and who decides it are threshold issues, we address them first. But, before addressing them, we must clarify how a court decides each question.

[¶ 10.] All arbitration analysis begins with recognition of the underlying principle that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT & T Technologies, Inc. v. Communications Workers of America,* 475 U.S. 643, 648, 106 S.Ct. 1415, 1418, 89 L.Ed.2d 648, 655 (1986) (citations omitted). "This axiom recognizes the fact that arbitrators derive their authority to resolve disputes only because the parties have agreed in advance to submit such grievances to arbitra-

tion." *Id.* at 648–49, 106 S.Ct. at 1418, 89 L.Ed.2d at 655 (citation omitted).

[¶ 11.]Therefore, in determining the question of *whether* a dispute should be arbitrated, there is a general presumption of arbitrability if there is an arbitration agreement:

> there is a presumption of arbitrability in the sense that "[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage."

*Id.* at 650, 106 S.Ct. at 1419, 89 L.Ed.2d at 656 (citations omitted). *See also Rossi Fine Jewelers, Inc. v. Gunderson,* 2002 SD 82, ¶ 13, 648 N.W.2d 812, 816. That presumption applies when a broad arbitration clause is reviewed, such as one agreeing to arbitrate "any differences arising with respect to the interpretation of this contract or the performance of any obligation hereunder...." *AT & T,* 475 U.S. at 650, 106 S.Ct. at 1419, 89 L.Ed.2d at 657 (citation omitted). However, the presumption is inapplicable in the presence of an "express provision excluding a particular grievance from arbitration" or "forceful evidence of a purpose to exclude the claim from arbitration...." *Id.* (citation omitted).

[¶ 12.] The next question of *who* initially determines whether a dispute should be arbitrated is also governed by contract principles, but it is reviewed utilizing a different presumption. Contractually:

> [T]he answer to the "who" question ... is fairly simple. Just as the arbitrability of the merits of a dispute depends upon whether the parties agreed to arbitrate that dispute, see, *e.g., Mastrobuono v. Shearson Lehman Hutton, Inc.,* 514

U.S. 52, 57, 115 S.Ct. 1212, 1216, 131 L.Ed.2d 76 (1995); *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 626, 105 S.Ct. 3346, 3353, 87 L.Ed.2d 444 (1985), so the question "who has the primary power to decide arbitrability" turns upon what the parties agreed about *that* matter.

*First Options,* 514 U.S. at 943, 115 S.Ct. at 1923, 131 L.Ed.2d at 992–93. However, the presumption is different. Who determines whether the agreement creates a duty to arbitrate the particular grievance is a question for *judicial determination* unless the parties clearly and unmistakably provide otherwise. *AT & T,* 475 U.S. at 649, 106 S.Ct. at 1418, 89 L.Ed.2d at 656. The Supreme Court explained:

> whether or not the company was bound to arbitrate, as well as what issues it must arbitrate, is a matter to be determined by the Court on the basis of the contract entered into by the parties.... The duty to arbitrate being of contractual origin, a compulsory submission to arbitration cannot precede judicial determination that the ... agreement does in fact create such a duty.

*AT & T,* 475 U.S. at 649, 106 S.Ct. at 1419, 89 L.Ed.2d at 656 (citation omitted). Therefore, "[c]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that they did so." *First Options,* 514 U.S. at 944, 115 S.Ct. at 1924, 131 L.Ed.2d at 994 (citation omitted).

**▮▮▮** [¶ 13.] We now turn to Johnson's first argument that an arbitrator, rather than the circuit court, should have determined arbitrability in this case. Johnson contends that the Flandreau–Johnson

agreement clearly expressed the parties' intent to have an arbitrator determine arbitrability. Johnson relies on *Johnson v. Polaris Sales, Inc.,* 257 F.Supp.2d 300 (D.Me.2003). Johnson argues that *Polaris* "held that an identical arbitration provision clearly and unmistakably evinced the parties' intent 'to submit questions regarding the scope of the ... arbitration clause [arbitrability] to the arbitrator.'"

[¶ 14.] *Polaris* did find "a clear and unmistakable intent on the part of the parties to submit questions regarding the scope of [that] *Dealer Agreement* arbitration clause to the arbitrator." *Id.* at 309 (emphasis added). However, the arbitration clause in that Agreement was significantly different than the one before us. Unlike this case, the parties in *Polaris* specifically agreed to arbitrate "arbitrability." *Id.* at 308. The Dealer Agreement stated:

> that "[a]ll disputes, controversies and claims arising out of or in connection with the ... interpretation ... of this Agreement, or of any provision of this Agreement (*including* without limitation this arbitration provision and *the arbitrability of any issue*) ... shall be solely and finally settled by arbitration...."

*Id.* (emphasis added). Considering this specific agreement to arbitrate "the arbitrability of any issue," the *Polaris* court understandably concluded that the parties intended that the arbitrator would initially determine arbitrability.

[¶ 15.]However, the *Polaris* finding of intent to arbitrate arbitrability is inapplicable to the Flandreau–Johnson construction agreement, which is silent on this subject.[5] Because the Flandreau–Johnson

---

5. The Supreme Court considered cases where the argument is silent or ambiguous:

> the law treats silence or ambiguity about the question *"who* (primarily) should decide

arbitrability" differently from the way it treats silence or ambiguity about the question *"whether* a particular merits—related dispute is arbitrable because it is within the

agreement contains no language agreeing to arbitrate arbitrability,[6] and because there is no clear and unmistakable evidence of intent to arbitrate arbitrability, the arbitrability of this dispute was not an issue for the arbitrator in the first instance, and the trial court properly decided this issue. *First Options*, 514 U.S. at 944, 115 S.Ct. at 1924, 131 L.Ed.2d at 994.

[¶ 16.] We next consider the "whether" question; *i.e. whether* Johnson's remaining issues (workmanship, quality of materials, breach of contract, and failure to comply with industry standards) are arbitrable or whether they relate to aesthetic effect. On this question we believe that the reasoning of the Arkansas Supreme Court in *May*, 320 Ark. 147, 895 S.W.2d 521, demonstrates that none of these underlying issues are arbitrable.

[¶ 17.] *May* is instructive because it involved a similar arbitration agreement and a remarkably similar dispute over an aesthetic claim. In *May*, a school contended that newly constructed floors had an unacceptable appearance. Like the case before us, that school alleged that the unacceptable appearance was caused by breach of contract and the failure to comply with the plans and specifications. The school specifically alleged that the construction company had:

negligently failed to properly apply the substituted product, negligently failed to properly clean the pre-finished floors, negligently supplied a defective product, breached its implied warranty of merchantability, and breached its express warranty of fitness for a particular purpose.

*Id.* at 522. Relying upon these issues, that contractor contended that the claim really involved breach of contract and negligence, which were not issues of aesthetic effect. However, the Arkansas Supreme Court concluded that the "complaint [was] based upon a question concerning 'aesthetic effect'" despite the *underlying* issues of failure to comply with plans and specifications, breach of contract, and defective products. *Id.* at 523. The Arkansas Court reasoned:

If the *appearance* of the concrete floors was not "totally unacceptable" as the plaintiff contends, then there would be no claim. Granted, the plaintiff's complaint refers to May Construction's negligently supplying a defective product and breach of warranties. However, if the aesthetic effect of the floors was not unacceptable, the product would not be defective and the warranties would not be breached. The plaintiff does not contend that the floor has cracked or been

scope of a valid arbitration agreement"— for in respect to this latter question the law reverses the presumption.
*First Options*, 514 U.S. at 944–45, 115 S.Ct. at 1924, 131 L.Ed.2d at 994 (emphasis in original).

6. We acknowledge that *Polaris* also stated that AAA Rule 8 (giving the arbitrator power to determine the scope of the arbitration agreement) is an indication of intent to have the arbitrator determine arbitrability. However, the primary focus of *Polaris* was the arbitration clause in the parties' Dealer Agreement. Indeed, *Polaris* relied on an 8th Circuit case that *Polaris* described as "requir-
ing inclusion of 'arbitrability' language in an arbitration clause before finding clear and unmistakable evidence." *Polaris*, 257 F.Supp.2d at 308 (citing *McLaughlin Gormley King Co. v. Terminix Int'l Co., L.P.*, 105 F.3d 1192, 1193–94 (8thCir.1997)). This focus on the parties' agreement is appropriate because these arbitration issues are matters of contract and they must be ultimately resolved by the parties' agreement. Therefore, even though *Polaris* mentioned AAA Rule 8 as a further justification for its conclusion, the decision does not support a per se finding of intent to arbitrate arbitrability based solely upon the incorporation of AAA Rule 8 in the agreement.

damaged due to defective sealer. Rather, the plaintiff contends the floors began experiencing "unsightly scuff marks." The contract provides "controversies or Claims relating to aesthetic effect" are not subject to arbitration. *Id.*

[¶ 18.] This reasoning also applies to the Flandreau–Johnson dispute.[7] Like the case in *May*, a review of Flandreau's complaint and the undisputed facts reveal that Johnson's issues of "breach of contract" and "failure to comply with industry standards" are nothing more than the underlying reasons why Flandreau has an aesthetic claim. Paragraph nine of the complaint reflects that the *claim* relates to the "finish of the interior." Furthermore, paragraph seventeen only sought damages for the "appearance of plaintiff's building." Therefore, this *claim* was plainly one for the *aesthetic effect* of Johnson's work.

[¶ 19.] This fact is confirmed by the uncontested affidavit of the school board president. The school board president stated:

> The masonry cement block walls of the building *look terrible.* The primary complaint is the *poor appearance* of the finished product. The *problems with the appearance include* but are not limited to an uneven variation of the texture of the block surfaces; chipped blocks, holes in surface texture, flaws in the block, conspicuous patches and apparent efforts to cover up chips and holes in the block; inconsistent tooling joints and poor tooling; variation in the width of tooling joints, some very narrow and some very wide; misalignment *of joints and misalignment of the surface of adjacent blocks;* joint cracking, inconsistent joint tooling with variations in the joint tooling including joints in the shape of a "V" to concaved tool joints to some joints that appear to have been tooled digitally. In addition, the contractor appears to have used different quality block creating *an inconsistent and ugly appearance* and, in the gym, changed in the middle of the wall the pattern of laying block from stacked bond to running bond. *All of this creates a very poor appearance* and appears to be very inferior workmanship.

> On two locations within the school building, the new addition attaches to the older structure. It is very easy to stand

---

7. Johnson attempts to distinguish *May* by first arguing that the contractor in *May* did not argue the threshold issue of who determines arbitrability. It is true that *May* did not specifically address who should initially determine arbitrability. However, we have decided that issue adversely to Johnson. Moreover, the *May* court ultimately made the determination that "the plaintiff's complaint [was] based upon a question concerning 'aesthetic effect'... [and t]he contract provide[d] 'controversies or [c]laims relating to aesthetic effect' [were] not subject to arbitration." 895 S.W.2d at 523. Therefore, in deciding that the matter was not subject to arbitration, the court necessarily determined that it was the appropriate forum to determine arbitrability; *i.e.* that the *court*, rather than an arbitrator, could determine that the dispute was not subject to arbitration.

Johnson also attempts to distinguish *May* by pointing out that the *May* court failed to consider that construction company's motion to stay proceedings and compel arbitration under the Uniform Arbitration Act (which provides that "any action or proceeding involving *an issue* subject to arbitration shall be stayed if an order for arbitration or an application therefor has been made under this section, or, if the issue is severable, the stay may be with respect thereto only"). *See* SDCL 21–25A–7 (emphasis added). While the *May* court did not specifically address this provision of the Uniform Arbitration Act, this provision only applies to "issues" that are subject to arbitration. Because we ultimately conclude that there are no issues subject to arbitration here, *May* is not distinguishable for its failure to discuss the Uniform Act.

in those two hallways and compare the quality of workmanship and appearance of those halls in the old building with the new. Clearly, *the appearance of the new building is significantly inferior* to the originally constructed high school building.

*All of this* has a substantial *negative impact* on the *aesthetic effect* of the building.

(Emphasis added.) And, like the school board president, Flandreau's expert confirmed that this claim only related to aesthetics. The expert's proposals for repair involved nothing more than painting, tuckpointing, or the installation of alternative surfaces to make the walls of the building appear differently.

[¶ 20.] We conclude that this evidence, the complaint, and the aesthetic exclusion are clear and unmistakable evidence that this dispute was not subject to arbitration. Furthermore, "it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *See AT & T*, 475 U.S. at 650, 106 S.Ct. at 1419, 89 L.Ed.2d at 656 (citation omitted). Therefore, this dispute was not subject to arbitration and the circuit court was the proper forum to determine whether the parties had agreed to arbitrate. *See id.* at 652, 106 S.Ct. at 1420, 89 L.Ed.2d at 657–58 (noting that when there is an "express exclusion or other forceful evidence, [a] dispute over the interpretation of [the agreement] ... is not subject to the arbitration clause. [If such evidence is present, t]hat issue should [be] decided by the [courts] and ... it should not [be] referred to the arbitrator.").

*Motion to Compel Alternative Dispute Resolution*

[¶ 21.] Johnson alternatively argues that "[u]nder the South Dakota Uniform Arbitration Act, '[a]ny action or proceeding involving *an issue* subject to arbitration shall be stayed if an order for arbitration or an application therefor has been made under § 21–25A–5....'" *See* SDCL 21–25A–7.[8] (Emphasis added). Johnson argues that the issues previously discussed (arbitrability, breach of contract, and product quality) involved non-aesthetic arbitrable matters that could not be severed from the aesthetic claim. However, we have previously concluded that none of these underlying issues were subject to arbitration. Because these underlying issues were not subject to arbitration, the trial court correctly concluded that Johnson was not entitled to compel arbitration.

[¶ 22.] Affirmed.

[¶ 23.] GILBERTSON, Chief Justice, and KONENKAMP and MEIERHENRY, Justices, and ENG, Circuit Judge, concur.

[¶ 24.] ENG, Circuit Judge, sitting for SABERS, Justice, disqualified.

---

8. SDCL 21–25A–7 provides:
   Any action or proceeding involving an issue subject to arbitration shall be stayed if an order for arbitration or an application therefor has been made under § 21–25A–5 or, if the issue is severable, the stay may be with respect thereto only. When the application is made in such action or proceeding, the order for arbitration shall include such stay.